*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PATRICIA MILLER, Personal Representative of the
ESTATE OF DOUGLAS L. MILLER,

   Plaintiff-Appellant,

v

KAMRAN R. JANJUA, M.D., PAUL F. BUCCHI,
M.D., VINCENT B. DIMERCURIO, M.D., ERICH
C. KICKLAND, M.D., MIDLAND EMERGENCY
ROOM CORP PC, MIDLAND RADIOLOGY
ASSOCIATES PC, and GREATER MIDLAND
EMERGENCY PHYSICIANS PC,

   Defendants,

and

SCOTT F. ROSS, M.D., CRAIG S. WEEKS, M.D.,
MIDMICHIGAN HEALTH, MIDMICHIGAN
MEDICAL CENTER–MIDLAND, and
MIDMICHIGAN PHYSICIANS GROUP,

   Defendants-Appellees.

UNPUBLISHED
January 23, 2026
8:57 AM

No. 367204
Midland Circuit Court
LC No. 19-006439-NH

Before: CAMERON, P.J., and KOROBKIN and BAZZI, JJ.

PER CURIAM.

-1-

Plaintiff appeals, by leave granted,[1] the trial court's order granting defendants' motion for summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact). We reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arose after decedent presented to the emergency room in 2016 with difficulty breathing. A computerized tomography (CT) scan indicated a "focal airspace consolidation" in his lung. The radiographer indicated that decedent's "[p]rimary differential considerations would include pulmonary infarct or focal pneumonia." Decedent was given antibiotics for pneumonia and discharged with instructions to follow up with his primary care providers. Four days after his discharge, decedent saw his primary care providers and reported that he was feeling better and was no longer suffering from his previous respiratory symptoms. About two years later, decedent was diagnosed with lung cancer in the same area as the focal airspace consolidation. Decedent ultimately died from lung cancer.

Plaintiff filed suit, alleging medical malpractice for the failure to diagnose decedent's lung cancer when he was treated for pneumonia in 2016. Plaintiff's sole expert witness, Dr. James B. Tucker, M.D., testified, as an expert in family medicine, that decedent's family-medicine doctors who saw him after his visit to the emergency room breached the standard of care by failing to order a follow-up CT scan after the initial scan revealed an abnormality in his lungs given decedent's other risk factors, specifically, his age, weight, and smoking history. At his deposition, Dr. Tucker testified that he had not consulted any medical literature to form his opinion; instead he relied on his experience, background, and "common sense."

Defendants moved for summary disposition, arguing that Dr. Tucker's opinion should be excluded because, having no support by any external sources, it was unreliable. They provided an article from "UpToDate"[2] which noted that most patients diagnosed with pneumonia who had "prompt clinical resolution after treatment do not require a follow-up chest radiograph[,]" but that "follow-up clinic visits are good opportunities to review the patient's risk for lung cancer based on age, smoking history, and recent imaging findings." Ultimately, the article "only

---

[1] *Estate of Douglas L. Miller v Janjua*, unpublished order of the Court of Appeals, entered February 28, 2024 (Docket No. 367204).

[2] The trial court described UpToDate in its opinion and order:

> According to its website, "UpToDate is the premiere evidence-based resource trusted by family medicine physicians for reliable answers to clinical decisions. Using UpToDate at the point of care is like having an experienced colleague by your side – a colleague who is deeply knowledgeable about the latest medical advances across 25 clinical specialties." "UpToDate authors and editors synthesize the available clinical evidence and best clinical practices to help [physicians] provide high-quality care to [their] patients and high standards of research."

recommend[ed] follow-up imaging for patients who independently meet criteria for lung cancer screening." Defendants submitted evidence showing that, in 2016, decedent did not satisfy the criteria for lung cancer screening because one criterion addressed patients aged 55 to 80, and decedent was 52 at the time. In response to defendants' motion, plaintiff provided two articles—a 2005 article from a radiology journal (the MacMahon article) and a 2011 study related to follow-up chest x-rays after pneumonia diagnoses (the Tang study).[3]

The trial court held a *Daubert* hearing[4] to compare Dr. Tucker's opinions to those of defendants' experts. Dr. Tucker testified that the UpToDate article was irrelevant because it did not address a patient like decedent who had an abnormality in their CT scan. He also claimed that the articles submitted by plaintiff supported his opinion. Specifically, the MacMahon article supported his opinion because it recommended follow-up imaging for patients with "nodules" in their lungs greater than eight millimeters in size, and the Tang study supported his opinion that a second CT scan should have been ordered because the study indicated that 1% to 3% of patients with pneumonia who received follow-up imaging were diagnosed with lung cancer, which he considered to be "pretty high."

Defendants' family-medicine experts testified that they believed decedent's treating physicians met the standard of care because no additional testing was required. One expert testified that Dr. Tucker's opinion reflected an older "common sense" view that any abnormal scan required repeat studies until resolution despite newer scientific studies demonstrating that unnecessary repeated scans could actually do more harm than good. Defendant's other expert testified that the standard of care did not warrant follow-up imaging for a patient who presented with a likely diagnosis of pneumonia whose symptoms ceased within the time frame of their antibiotic course, because this improvement indicated that the diagnosis was correct and properly addressed.

The trial court found that Dr. Tucker's opinions were inadmissible under MRE 702 because plaintiff "failed to submit any evidence" that his testimony was "anything more than [his] own opinions based upon his experience and background." It further found that the MacMahon article and Tang study were contrary to Dr. Tucker's opinion. Accordingly, the trial court granted defendants' motion for summary disposition after excluding Dr. Tucker's testimony. Plaintiff now appeals.

## II. STANDARDS OF REVIEW

We review a trial court's decision on a motion for summary disposition de novo. *Danhoff v Fahim*, 513 Mich 427, 441; 15 NW3d 262 (2024). A motion for summary disposition under MCR 2.116(C)(10) "tests the factual sufficiency of the claim." *Id*. at 441. "A trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the

---

[3] Heber MacMahon, MB, BCh, BAO, et al, *Guidelines for Management of Small Pulmonary Nodules Detected on CT Scans: A Statement from the Fleischner Society*, 396 Radiology 395 (2005); Karen L. Tang, M.D., et al, *Incidence, Correlates, and Chest Radiographic Yield of New Lung Cancer Diagnoses in 3398 Patients with Pneumonia*, 171 Arch Intern Med 1193 (2011).

[4] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2789; 125 L Ed 2d 469 (1993).

motion." *Id*. "A motion for summary disposition may only be granted on this basis when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citations omitted).

"The proper interpretation of statutes and the Michigan Rules of Evidence is also reviewed de novo." *Id*. "Evidentiary issues are reviewed for an abuse of discretion." *Id*. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*. at 442. "A trial court necessarily abuses its discretion when it makes an error of law." *Id*.

## III. ANALYSIS

Plaintiff argues that the trial court abused its discretion by excluding Dr. Tucker's testimony and granting defendants' motion for summary disposition. We agree.

"A plaintiff in a medical malpractice action bears the burden of establishing (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Id*. (quotation marks and citations omitted). "Generally, a plaintiff must produce expert testimony to support their position as to the standard of care in their case and that the standard was breached." *Id*. "The proponent of the evidence—in this case, plaintiff—bears the burden of demonstrating the relevance and admissibility of the expert's opinions." *Id*. "To do so, plaintiff must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955, and MCL 600.2169." *Id*. at 442-443 (quotation marks and citations omitted). MCL 600.2169 is not at issue in this case because Dr. Tucker's qualifications are not in dispute.

MRE 702 governs the admissibility of expert testimony. At the time the trial court granted defendants' motion, it provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702, as amended by 469 Mich cxci (2003).]

A trial court evaluating expert testimony under MRE 702 "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Danhoff*, 513 Mich at 448 (quotation marks and citations omitted). "A lack of supporting literature is an important but not dispositive factor in determining whether a medical malpractice plaintiff's expert's testimony is admissible." *Id*. "[U]nder MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Id*. at 449 (quotation marks and citation omitted). Our Supreme Court has held that an expert's testimony was not based on reliable principles or methods when it was contradicted by

the defendant's expert and had no published literature to support it. *Edry v Adelman*, 486 Mich 634, 640-641; 786 NW2d 567 (2010); see also *Elher v Misra*, 449 Mich 11, 25-26; 878 NW2d 790 (2016) (agreeing with the trial court that an expert's opinion, which was disproven by literature, was not reliable because the expert provided no contrary literature and was unable to demonstrate that his opinion was widely accepted in his community).

The trial court found that the MacMahon article and Tang study did not support Dr. Tucker's opinion. Regarding the MacMahon article, the trial court reasoned:

> Notwithstanding the differences between the lung abnormality studied in the MacMahon Article (nodules) and the lung abnormality indicated in [decedent's] CT report (pneumonia), the MacMahon Article contradicts Dr. Tucker's position that every patient with an abnormal CT must receive a follow-up CT. The article states that "we do not recommend follow-up CT for every small indeterminate nodule[,]" "in selected cases with suspicious morphology or in high-risk subjects, a single follow-up scan in 12 months should be considered[,]" "[t]he radiation burden [of follow-up imaging] for the affected population is also substantial, and this could be a cause of cancer in itself[,]" "[t]he patient's age and the presence of comorbid conditions should influence management recommendations[,]" and, in consideration of legal liability, the article recognizes that "recommending follow-up studies for all indeterminate opacities is partly related to perceived liability if a cancer should develop . . . it may prove difficult to convince . . . that follow-up CT of every nodule in every patient is unnecessary" and the article supports a "practical and medically appropriate approach to the management of incidentally detected small pulmonary nodules." This literature does agree with Dr. Tucker that, as of 2005, it was the accepted practice to follow up every abnormality. However, the conclusion of the article fails to support Dr. Tucker's opinion, suggests that his position is outdated, and is actually consistent with Defendants' position that [decedent] did not require follow-up imaging because he did not independently meet the criteria for recommended follow-up based upon his age in 2016.

As for the Tang study, the trial court reasoned:

> Dr. Tucker testified that the Tang Article supports his opinion because, based on the results of its study, 1-3% of patients that had pneumonia were diagnosed with lung cancer after having follow-up imaging, which he testified was a "high number."
>
> However, the Tang Article actually contradicts Dr. Tucker's position that every patient with an abnormal CT must receive a follow-up CT. It references the evidence-based guidelines published by the Infectious Disease Society of America and the American Thoracic Society on the diagnosis, treatment, and follow-up of pneumonia and states that the purpose of the study was to provide evidence related to recommendations for chest radiographic follow-up. The Tang study concluded that "[t]he incidence of new lung cancer after pneumonia is *low*: approximately 1% within 90 days and 2% over 5 years. Since 98% to 99% of patients will not have lung cancer, we believe routine follow-up chest radiographs (other than those

indicated for ongoing pneumonia-related symptoms) are not warranted." (Emphasis added.) As noted, Dr. Tucker opined that the 1-3% lung cancer diagnosis after follow up was a "high number," which is not consistent with the article's conclusion. . . .

Nevertheless, the Tang Article does suggest that "the greatest potential diagnostic yield for lung cancer could be realized by restricting routine chest radiographic follow-up to patients 50 years or older, particularly those who are male or smoke[,]" which could support an argument that [decedent] required follow-up imaging for lung cancer screening based upon his age, gender, and smoking history. However, [one of defendants' experts] testified that, because the Tang Article was published in 2011, it is unclear what the guidelines were for screening in 2011 and how many of the patients in that study would have qualified for lung cancer screening anyway.

The trial court's reasoning was based on its interpretation that the literature did not support a standard of care that mandated follow-up imaging for decedent. But this oversimplifies the literature's findings. Both the MacMahon article and the Tang study indicated that follow-up imaging was most useful for high-risk patients, such as male patients over 50 who smoked. While the guidelines provided had since elevated the screening age to 55, the studies supported Dr. Tucker's opinion that, generally, abnormal radiographic imaging in a high-risk patient, such as decedent, warranted follow-up imaging. Moreover, even though defendant's experts disagreed with Dr. Tucker's application of the MacMahon article and the Tang study to this case, "[t]he fact that two scientists value the available research differently and ascribe different significance to that research does not necessarily make either of their conclusions unreliable." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 139; 732 NW2d 578 (2007).

A *Daubert*-type hearing of this kind is *not* a judicial search for truth. The courts are unlikely to be capable of achieving a degree of scientific knowledge that scientists cannot. An evidentiary hearing under MRE 702 and MCL 600.2955 is merely a *threshold* inquiry to ensure that the trier of fact is not called on to rely in whole or in part on an expert opinion that is only masquerading as science. The courts are not in the business of resolving scientific disputes. The only proper role of a trial court at a *Daubert* hearing is to filter out expert evidence that is unreliable, not to admit only evidence that is unassailable. The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation. [*Id*.]

The literature plaintiff provided was sufficient to demonstrate that Dr. Tucker's opinion was "rationally derived from a sound foundation." *Id*. Accordingly, the trial court erred when it deemed Dr. Tucker's testimony unreliable. Because Dr. Tucker's expert testimony was admissible, the trial court erred in summarily dismissing plaintiff's case on the basis of plaintiff's inability to establish the standard of care.

Reversed and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Daniel S. Korobkin
/s/ Mariam S. Bazzi